# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 14, 2012

## STATE OF TENNESSEE v. FRANK L. GLAVIN

**Appeal from the Circuit Court for Bedford County**
**No. 17226      F. Lee Russell, Judge**

---

**No. M2012-00550-CCA-R3-CD - Filed February 14, 2013**

---

The Defendant-Appellant, Frank L. Glavin, appeals his convictions for evading arrest, a Class E felony, and violating the noncriminal implied consent law. He argues on appeal that the evidence was insufficient to support the aforementioned convictions. Upon review, we affirm the judgment of conviction for evading arrest, and we reverse and vacate the judgment of conviction for violating the noncriminal implied consent law.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Reversed and Vacated in Part**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined. ROBERT W. WEDEMEYER, J., filed a concurring in part and dissenting in part opinion.

Mitchell J. Ferguson, Murfreesboro, Tennessee, for the Defendant-Appellant, Frank L. Glavin.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Charles F. Crawford, Jr., District Attorney General; and Christopher Collins, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The Bedford County Grand Jury indicted Glavin for evading arrest; driving under the influence (DUI), second offense; violating the implied consent law; speeding; and failing to produce a vehicle registration. On October 25, 2011, a Bedford County Circuit Court jury convicted Glavin of evading arrest, violating the implied consent law, speeding, and failing to produce a vehicle registration. The jury was unable to reach a verdict on the charge of DUI, second offense.

On January 5, 2012, regarding the outstanding charge of DUI, second offense, Glavin entered a guilty plea to DUI, first offense. That same day, the trial court sentenced Glavin as a Range I, standard offender to one year in the county jail for the evading arrest conviction, revoked his driver's license for one year for violating the implied consent law, and ordered him to pay a $50 fine for the speeding conviction and a separate $50 fine for the registration conviction. The court also sentenced Glavin as a Range I, standard offender to forty-eight hours of confinement for the DUI conviction to be served concurrently with the evading arrest conviction, for an effective sentence of one year in the county jail.

At the October 25, 2011 trial, Trooper Barry Qualls, Jr., testified that he had worked for the Tennessee Highway Patrol for nearly ten years and currently worked as a K-9 officer. He also stated that he had served eighteen years as a military policeman for the United States Army.

On Friday, January 14, 2011, at 11:40 p.m., Trooper Qualls said he was on patrol in a rural area of Bedford County on Route 270. He was "running radar" as he approached the intersection of Highway 41A North and Route 270. As he headed towards the intersection, he observed a car coming over the crest of a hill driving at a fast rate of speed. His radar device confirmed that the driver of the car, later identified as Glavin, was traveling at a rate of sixty-seven miles per hour in a forty-five mile-per-hour speed zone. Trooper Qualls said that he was .2 miles away from Glavin when he clocked Glavin driving at sixty-seven miles per hour.

Trooper Qualls said that he immediately slowed down and activated his blue lights, which signaled to Glavin that he was initiating a traffic stop. He stated that Route 270 is a two-lane road with no shoulder, so he slowed down to make a three-point turn so he could follow Glavin. Before Trooper Qualls could turn around, Glavin drove past his patrol car. He said that the driver's side window of his patrol car was lowered that night because he was smoking, and he heard Glavin's car accelerate as it drove past. When he realized Glavin was not going to stop, Trooper Qualls turned on his video camera and alerted dispatch. He began traveling at 110 to 120 miles per hour in order to catch up to Glavin. Trooper Qualls said he had to drive approximately 1.6 miles before he caught up with Glavin's vehicle.

During his pursuit, Trooper Qualls said Glavin turned onto Zion Hill Road. He said that Glavin's house was on Janna Lane, which was .7 of a mile away from the point where Glavin stopped his car. Trooper Qualls said that the area in which he pursued Glavin not heavily traveled at night and that many other individuals had been able to outrun him in that area because there were so many back roads. He described the area as "a big circle maze of roads," which allowed drivers to lose officers.

When he realized that Glavin was coming to a stop, Trooper Qualls alerted dispatch that the car he had been pursuing was stopping. He then approached the vehicle, and Glavin opened his door because he was unable to lower his window. Trooper Qualls observed that there were two individuals in the car. He said he then "smelled a strong odor of intoxicant coming out of the vehicle." He informed Glavin that he had been driving sixty-seven miles per hour in a forty-five mile-per-hour speed zone. Glavin gave him his driver's license after fumbling to find his insurance card. Trooper Qualls said that Glavin was unable to provide the current registration for the car he was driving. During their interaction, Trooper Qualls noticed that Glavin had "bloodshot, watery eyes" and "slurred speech."

Trooper Qualls said that the video recording of the stop did not depict everything that occurred during his conversation with Glavin because the camera's microphone "cut[] in and out, depending on the distance of the vehicles" and the batteries often stopped working at the end of a shift. Glavin told Trooper Qualls that he and his roommate had been to a restaurant in Columbia and were returning home. Trooper Qualls told Glavin to wait while he checked his driver's license. At that point, Trooper Qualls stated that he believed Glavin was under the influence of an intoxicant. When he returned, Trooper Qualls asked Glavin to perform some field sobriety tests, and Glavin told him that he was declining to submit to the field sobriety tests on the advice of his attorney. Trooper Qualls then told Glavin to sit in his vehicle and called for backup. After a few minutes, Deputies Benji Burris and Cam Newton arrived, took Glavin into custody, and placed him in the back of their patrol car. Prior to being placed in the patrol car, Glavin became agitated and kept saying, "[W]hy don't you just let me go home[?]" Trooper Qualls advised Glavin that he was under arrest.

Trooper Qualls said that he got his dog out of his patrol car as "an intimidation factor" because Glavin was "a little bit bigger" than him and because Glavin had a friend with him in the car. He stated that he smelled "a strong smell of intoxicant" coming off of Glavin's person, even after he got Glavin out of his car and away from his friend.

Once Glavin was transported to the magistrate's office at the jail, Trooper Qualls read the entire implied consent form to him. After the implied consent form was admitted into evidence, Trooper Qualls read the form to the jury. Trooper Qualls stated that Glavin refused to sign the document. Trooper Qualls asked if Glavin would submit to a blood test, and Glavin refused. Trooper Qualls marked the implied consent form showing that Glavin refused to submit to tests.

The video of Glavin's traffic stop was played for the jury. The video showed Trooper Qualls leaning into the vehicle to detect the odor of an alcoholic beverage or narcotics in the car. It also showed Trooper Qualls asking Glavin if he would submit to a blood test, and Glavin responding, "No." Trooper Qualls stated that even though he asked for Glavin to submit to a blood test during the traffic stop, he also read the implied consent form to Glavin

-3-

at the magistrate's office. He acknowledged that it was "mandatory" that he read the implied consent form to all individuals arrested for DUI. Trooper Qualls opined that "[Glavin] was under the influence at the time of arrest."

On cross-examination, Trooper Qualls admitted that he did not "call out a pursuit" to dispatch because he had not "had the opportunity to catch up with [Glavin] yet and see if he was going to stop." He explained that if he had called out a pursuit, dispatch would have "notified all [the] surrounding agencies, even other troopers, to come to [his] location." Trooper Qualls acknowledged that Glavin stopped on Zion Hill Road when he got close to him. He also acknowledged that Glavin turned on his right turn signal when his patrol car was approximately a quarter of a mile behind him.

When asked if he was sure that Glavin saw his blue lights when he first clocked him on the radar near the intersection of Route 270 and Highway 41A North, Trooper Qualls said, "It's kind of obvious when you're coming right at me[,] and you're in front of me[,] and I activate my blue lights." Then he said that Glavin "made the split second decision to fight or flight, and he chose to try to get away." Because it took 1.6 miles to catch up to Glavin, Trooper Qualls said Glavin "wasn't slowing down." He also said that he first told dispatch that he was trying to catch up to Glavin after he turned around to go after him. Trooper Qualls said the camera was not recording at the time when he first activated his blue lights because the camera "was not synchronized correctly[.]" He acknowledged that he was at fault for not manually turning on the camera earlier. Trooper Qualls admitted that Glavin's refusal to submit to field sobriety tests did not violate the implied consent law. He also admitted that Glavin had a valid driver's license the night he was arrested. Trooper Qualls denied telling Glavin that refusing field sobriety tests would get him arrested for DUI whether he was guilty or not.

Trooper Qualls confirmed that Glavin had seen his blue lights when he first activated them because Glavin had not yet passed his patrol car and he had "no choice but to see them or be blinded by them." He acknowledged that the recording did not show that his blue lights were activated as he approached the intersection of Route 270 and Highway 41A.

Trooper Qualls said that the magistrate witnessed him reading the implied consent form to Glavin, although he did not have the magistrate sign the form as a witness. He said that he did not have Glavin sign the implied consent form because he never gives the people he arrests a "sharp object" that could be used as a weapon against him. He added the Tennessee Highway Patrol's policy did not require that defendants sign the implied consent form, "as long as it is read to them." He acknowledged that there was no record of him reading the form to Glavin other than his testimony. However, he maintained that everything he did the night of Glavin's arrest was according to Tennessee Highway Patrol policy. Trooper Qualls acknowledged that no liquor or beer bottles were found in Glavin's car.

-4-

However, he said that Glavin staggered when he got out of his vehicle, although the video recording did not show this because the deputies on the scene were blocking the camera.

On re-direct examination, Trooper Qualls stated that Glavin was driving down a hill and he was facing Glavin at the bottom of this hill when he first activated his blue lights. He said that Glavin initially slowed down before accelerating past him. Trooper Qualls said that Glavin's passenger admitted to drinking four beers that night and that Glavin smelled of alcohol more than the passenger, even though the passenger was too intoxicated to drive.

Glavin testified on his own behalf. He stated that on January 14, 2011, he and his roommate went to Lucy's restaurant in Columbia at approximately 10:30 p.m. Glavin said that he did not consume any alcohol at the restaurant, although his roommate did, and they left the restaurant some time between 11:15 and 11:30 p.m. He said that he passed his home going east on Route 270 because he was headed to the market at the corner of Route 270 and Highway 41A for a pack of cigarettes. When he discovered the market was closed, he turned around in a gravel area across the street from the market and turned onto Route 270 heading west.

Glavin stated that he did not see Trooper Qualls's blue lights until he was near Evergreen Drive, which is the road just before Zion Hill Road. He denied passing Trooper Qualls near the intersection of Route 270 and Highway 41A. He said that he "most likely" would have seen an officer's blue lights if the officer had passed him with the blue lights activated. Glavin said that although he normally turned onto the next road, Thompson Road because it was the closest route to his home, he turned on Zion Hill Road because he saw the Trooper Qualls's blue lights. He said that if there had been alcohol on his breath that night, it would have been because he had something to drink when he ate lunch at 3:00 p.m. that day, which was approximately nine hours prior to being stopped by Trooper Qualls. Glavin said that he might have had bloodshot eyes that night because he had been crying as a result of a fight with his girlfriend. When his attorney asked him if he was unstable on his feet during the stop, he replied, "Absolutely not." He claimed to have followed all of Trooper Qualls's instructions during the stop.

Glavin said that Trooper Qualls never read him the implied consent form at the magistrate's office and never asked him to sign the form. He also said that he never saw Trooper Qualls at the magistrate's office. Instead, Glavin said that the officers who transported him to the jail put him directly into a holding cell, where he stayed for eight hours until he was booked. Glavin stated, "I can unequivocally tell the jury that nobody ever read that form to me." He also denied being impaired the night of the incident.

On cross-examination, Glavin acknowledged that he had a commercial driver's license but had not used it since 2005. He asserted that although he first saw Trooper Qualls's blue

lights at Evergreen Drive, he did not stop there because he was traveling too fast. He admitted that Lucy's was a "club, restaurant, bar" with a dance floor. He also admitted that he drank three or four margaritas in two hours during his late lunch the day of his arrest. Glavin said that he refused to take the field sobriety tests because he "had always been told that if you take the test, you're giving up your rights." He admitted that he refused the blood alcohol test offered by Trooper Qualls. However, he claimed that he did not know he would lose his license for failing for submit a blood sample. He reiterated that he stopped as soon as he saw Trooper Qualls's blue lights and never saw Trooper Qualls's blue lights near the intersection of Route 270 and Highway 41A.

Elizabeth Lucas, Glavin's girlfriend, testified that the day of Glavin's arrest, she and Glavin "had a little verbal thing over the phone because [she] wanted to date other people and not just him and he was hurt by that." She acknowledged that Glavin drank socially and that she had seen him impaired "[a]t the house."

## ANALYSIS

Glavin argues that the evidence was insufficient to sustain his convictions for felony evading arrest and violating the implied consent law. The State responds that it was the jury's prerogative to accredit Trooper Qualls's testimony and that the evidence was sufficient to support the two convictions. Although we agree that the evidence was sufficient to sustain the evading arrest conviction, we reverse and vacate the judgment of conviction for violating the noncriminal implied consent law because the jury instead of the general sessions court made the determination that he had committed this offense.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this

court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

First, Glavin argues that the evidence was insufficient to sustain his conviction for evading arrest because his testimony and the video recording established that he immediately stopped on Zion Hill Road upon seeing Trooper Qualls's blue lights. Glavin was convicted of evading arrest, a Class E felony, in violation of Tennessee Code Annotated section 39-16-603, which states in pertinent part: "It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to

elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." T.C.A. § 39-16-603(b)(1). A violation of this section is a Class E felony "unless the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties, in which case a violation of subsection (b) is a Class D felony." Id. § 39-16-603(b)(3).

Trooper Qualls testified that he was .2 miles away from Glavin's oncoming car when he first activated his blue lights. He stated that he was certain that Glavin saw his blue lights because Glavin had not passed his approaching patrol car on Route 270, because Glavin was on higher ground than he was, and because Glavin had "no choice but to see them or be blinded by them." Trooper Qualls said that as Glavin's car passed him, Glavin slowed down before accelerating past him. He said that Glavin made a "split second decision to fight or flight, and he chose to try to get away." He opined that because he had to travel 1.6 miles to catch up with Glavin, Glavin "wasn't slowing down" during his pursuit. Although Glavin testified that he stopped at Zion Hill Road as soon as he saw Trooper Qualls's blue lights, it was the jury's prerogative to accredit the testimony of Trooper Qualls over the testimony of Glavin. See Odom, 928 S.W.2d at 23. Accordingly, we conclude that the evidence was sufficient to sustain Glavin's conviction for felony evading arrest.

Second, Glavin contends that because the jury was unable to reach a verdict on the DUI charge, Trooper Qualls had no basis upon which "to ask for a test[,]" which he alleges is required in order to convict him of violating the implied consent law. He claims that "there was minimal proof put before the jury that could lead a reasonable juror to conclude that the defendant was impaired." He also claims that he was only observed speeding, that he immediately stopped upon seeing the blue lights, that he obeyed all traffic rules when he turned right on the first available road, that he provided his license and registration, that the officer was unable to determine whether the smell of alcohol was coming from him or his passenger, that the officer never asked him to perform any field sobriety tests, and that he complied with each of the officer's requests. He also argues that the video recording of the traffic stop shows that he immediately stopped upon seeing the officer's blue lights and that he exhibited no signs of impairment during the stop.

The State responds that Trooper Qualls had reasonable grounds to believe that Glavin was driving while under the influence of alcohol pursuant to Tennessee Code Annotated section 55-10-406, despite the fact that the jury could not agree that Glavin was guilty of DUI beyond a reasonable doubt. The State also asserts that Glavin's refusal to submit to the blood alcohol test supports his conviction for violating the implied consent law.

The implied consent law states the following, in pertinent part:

(a)(1) Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401 . . . .

. . . .

(3) Any law enforcement officer who requests that the driver of a motor vehicle submit to either or both tests authorized pursuant to this section, for the purpose of determining the alcohol or drug content, or both, of the driver's blood, shall, prior to conducting either test or tests, advise the driver that refusal to submit to the test or tests will result in the suspension by the court of the driver's operator's license; if the driver is driving on a license that is cancelled, suspended or revoked because of a conviction for vehicular assault under § 39-13-106, vehicular homicide under § 39-13-213, aggravated vehicular homicide under § 39-13-218, or driving under the influence of an intoxicant under § 55-10-401, that the refusal to submit to the test or tests will, in addition, result in a fine and mandatory jail or workhouse sentence; and if the driver is convicted of a violation of § 55-10-401, that the refusal to submit to the test or tests, depending on the person's prior criminal history, may result in the requirement that the person be required to operate only a motor vehicle equipped with a functioning ignition interlock device. . . .

(4)(A) If such person, having been placed under arrest and then having been requested by a law enforcement officer to submit to either or both tests, and having been advised of the consequences for refusing to do so, refuses to submit, the test or tests to which the person refused shall not be given, and the person shall be charged with violating this subsection (a). The determination as to whether a driver violated this subsection (a) shall be made at the driver's first appearance or preliminary hearing in the general sessions court, but no later than the case being bound over to the grand jury, unless the refusal is a misdemeanor offense in which case the determination shall be made by the court which determines whether the driver committed the offense; however, upon the motion of the state, the determination may be made at the same time and by the same court as the court disposing of the offense for which the driver was placed under arrest. If the court finds that the driver violated this

subsection (a), except as otherwise provided in subdivision (a)(5), the driver shall not be considered as having committed a criminal offense; however, the court shall revoke the license of the driver for a period of:

(i) One (1) year, if the person does not have a prior conviction for a violation of § 55-10-401, § 39-13-213(a)(2), § 39-13-218, § 39-13-106, or § 55-10-418, in this state, or a similar offense in any other jurisdiction;

(ii) Two (2) years, if the person does have a prior conviction for an offense set out in subdivision (a)(4)(A)(i);

. . . .

(B) For the purposes of this subdivision (a)(4), "prior conviction" means a conviction for one (1) of the designated offenses, the commission of which occurred prior to the DUI arrest giving rise to the instant implied consent violation.

T.C.A. § 55-10-406 (Supp. 2011) (amended 2012) (emphasis added).

Here, the record shows that Glavin was charged with violating the noncriminal implied consent law. Tennessee Code Annotated section 55-10-406(a)(4)(A) specifically states that the determination as to whether an individual violated the noncriminal implied consent law "shall be made at the driver's first appearance or preliminary hearing in the general sessions court, but no later than the case being bound over to the grand jury[.]" However, that section also states that "upon the motion of the state, the determination may be made at the same time and by the same court as the court disposing of the offense for which the driver was placed under arrest." Id. § 55-10-406(a)(4)(A). Although this statute gives the trial court, rather than a jury, the authority to determine whether the noncriminal implied consent law was violated, the record shows that the Bedford County Circuit Court jury made the determination that Glavin violated the noncriminal implied consent law in this case. See id. § 55-10-406(a)(5) (stating that "if the court or jury finds that the driver violated this subsection (a) while driving on a license that was revoked, suspended, or cancelled because of a conviction for vehicular assault under § 39-13-106, vehicular homicide under § 39-13-213, aggravated vehicular homicide under § 39-13-218, or driving under the influence of an intoxicant under § 55-10-401, the driver commits a Class A misdemeanor"); Compare State v. Andrew Reginald MacKinnon, No. E2009-00093-CCA-R3-CD, 2011 WL 1460167, at *3 (Tenn. Crim. App. Mar. 30, 2011) (concluding that the trial court, rather than a jury, has the authority to determine whether a violation of the noncriminal implied consent law occurred), with State v. Lee Stanley Albright, No. E2007-02671-CCA-R3-CD, 2008 WL 5130691, at *4 (Tenn. Crim. App. Dec. 8, 2008) (concluding that the jury's determination

of whether the defendant violated the noncriminal implied consent law was proper). Moreover, this determination should have been made by the general sessions court rather than the criminal court, unless the State filed a motion requesting that the criminal court make the determination at the same time that it disposed of the offenses for which the driver was arrested. See id. § 55-10-406(a)(4)(A). No such motion appears in the record. Consequently, we must reverse and vacate the trial court's judgment of conviction regarding the noncriminal implied consent violation and must dismiss count three of the indictment charging Glavin with violating the noncriminal implied consent law.

Finally, Glavin contends that it was plain error for the jury to view the videotape of the stop a second time when it contained information that Glavin had previously been convicted of DUI. We initially note that Glavin's attorney had no objection to playing the video recording of the stop for the jury at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We also note that Glavin has presented absolutely no argument, no citations to legal authorities, and no references to the record regarding this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Id.; State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Consequently, this issue is waived.

## CONCLUSION

We conclude that the evidence was sufficient to sustain Glavin's conviction for evading arrest. Accordingly, we affirm the judgment of conviction for evading arrest, and we reverse and vacate the judgment of conviction for violating the noncriminal implied consent law and dismiss that count of the indictment.

_____
CAMILLE R. McMULLEN, JUDGE